In the Matter of the Accounting of GEORGEA N. HAYS et al., as Executrices of FRANK M. HAYS, Deceased Executor of JASON T. LONAS, Deceased.

Surrogate's Court, Broome County, December 2, 1949.

*Jefferson F. Meagher* for executrices, petitioners.

*E. Stanley Pier* and *Dennis J. Kilkenny* for Ella M. Simmons, respondent.

*Merchant, Waite & Waite* and *Lawrence O. Waite,* in person, for Lawrence O. Waite, as administrator *c. t. a.* of Jason T. Lonas, deceased.

*Frank D. Croft* and *Theodore H. Cohn* for residuary legatees of Mary C. Beecher, deceased, respondents.

PAGE, S. In this proceeding for the judicial settlement of executrices' accounts (original and supplemental), numerous objections had been filed by the administrator *c. t. a.* of the estate of Jason T. Lonas, deceased. As a result of clarifications of the original account, most of these objections have been withdrawn. As to all but one of the others, surcharges have been agreed to. It is unnecessary, therefore, in this decision to take up any of the objections except the one as to which the following consideration is in order.

In 1943, Frank M. Hays, who was an attorney at law, had been, for some time, executor of the last will and testament of said Jason T. Lonas, deceased. He was also at that time executor of the last will and testament of Mary C. Beecher, deceased. He remained the executor of each estate until the date of his death in 1948. During the last several years of his life, Mr. Hays was a man well along in age and in ill-health. As an understatement, it may be said that his affairs in relation to these two estates and others were left in a somewhat tangled condition. Counsel for his accounting executrices herein has an unenviable retainer in respect to straightening out the various estates of which Mr. Hays formerly was in charge.

It is undisputed that, in 1943, among the assets of the Beecher estate, there was a certain bond and mortgage, known and designated as the "Whaley mortgage". After Mr. Hays' death, there was found among his office papers an assignment of this mortgage, dated November 1, 1943, from himself as executor of the Beecher estate to himself as executor of the Lonas estate, containing a covenant of principal remaining unpaid in the sum of $1,100. This assignment of mortgage is still unrecorded.

There is no absolutely conclusive evidence either way as to whether or not any consideration and, if any, how much, moved from the Lonas estate into the Beecher estate in connection with this assignment. It appears that there was an item of $900, which is not specifically identified with any particular asset, and which, some time after the assignment, was entered in a bank account to the credit of the Beecher estate. Such records as are available indicate that the first interest payment on the Whaley mortgage subsequent to the assignment was entered in the handwriting of Mr. Hays' office secretary still to the credit of the Beecher estate. This entry was changed in the handwriting of Mr. Hays, crossing out the name "Beecher" and substituting "Lonas estate", and subsequent interest payments were uniformly credited to the Lonas estate. A mortgagee clause, naming the Lonas estate, was attached to the Whaley insurance policy, but not until 1947.

It is the contention of the administrator *c. t. a.* of the Lonas estate that the validity and effect of the assignment of the Whaley bond and mortgage is absolute and, therefore, must be treated as not being open to question because of possible, or even probable, want of consideration. This contention is founded upon subdivision 4 of section 33 of the Personal Property Law (identical with its teammate subdivision 3 of section 279 of the Real Property Law), providing: "An assignment hereafter made shall not be denied the effect of irrevocably transferring the assignor's rights because of the absence of consideration, if such assignment is in writing and signed by the assignor, or by his agent."

Counsel for the Lonas estate relies on the above-quoted provision of section 33 of the Personal Property Law as an absolute and unquestionable criterion. But, as will be seen, as the present case reasons out, its application in this instance is of small, if any import. The present situation would be practically the same if this statute had never been enacted.

Before entering upon a very brief discussion of each of the factors comprising the contention of the Beecher estate, it may be well to mention that, in addition to his reliance upon the above-quoted statute as controlling in the present situation, the brief of one of the counsel representing respondents herein identified in interest with the other (Lonas) estate has set forth an argument to the effect that this, a Surrogate's Court, since the issue involves the application of equitable principles, has no jurisdiction to consider and apply such principles, but that the Surrogate is limited strictly to taking the quoted statute as he finds it, without troubling himself at all in relation to considering the situation as it might, could or should be treated in a court of general jurisdiction. Numerous authorities are cited in support of this position, as, e.g., *Matter of Keeler* (109 Misc. 476). But they are all previous to 1921. Since the extensive liberalizing revision of 1914 (L. 1914, ch. 443) and, especially, since the Legislature clarified its intent as to such liberalization by an amendment of section 40 of the Surrogate's Court Act in 1921 (L. 1921, ch. 439), in all cases where the Surrogate has any jurisdiction at all, it is full and complete. Unquestionably as section 40 the Surrogate's Court Act has been construed and applied in authoritative cases since 1921, a Surrogate's Court is double-barreled and as loaded with equity as any other court as to any and all issues within the scope of its jurisdiction of decedents' and infants' estates. (See *Matter of Raymond* v. *Davis*, 248 N. Y. 67.) In the present case, the question of a cancellation of the assignment, or the alternative adjudication of a constructive trust, is well within the jurisdiction.

The contention of respondents comprising residuary legatees of the Beecher will consists of a series of several related parts, viz.: (1) that the above-quoted statutory provision has no application in cases involving fraud in relation to the inception and execution of the instrument in question; (2) that this is surely true in this case because of the circumstances surrounding the assignment being "suspicious"; (3) that the existence of a fraudulent purpose motivating such transaction does not need to be proven by direct evidence and may be inferred from the circumstances; (4) that, despite the initial presumption of *bona fides* (or of no fraud), that the "suspicious circumstances" provide an adequate basis for the inference of fraud, and (5) that, under the circumstances, the burden of proof to show freedom from fraud is upon the party charged with the over-all burden of proof as to its account as a whole, in this case the Lonas estate.

I can and do readily agree with counsel for the Beecher estate as to the correctness of his position with respect to each of these five links in his chain of contention, but qualifiedly as to the antifraud presumption because of unique circumstances herein, as will be noted. The result would eventuate in favor of the Beecher estate, except for the necessity of determining the overall preponderance of evidence, as affected by the composite consideration of all the properly applicable presumptions and inferences, together with all other evidentiary elements.

At least on the face of the transaction, there was no violation of fiduciary duty in liquidating the Whaley mortgage in 1943. This was a part of the executor's duty in preparation for final distribution. Likewise, he was acting in accordance with his fiduciary function in acquiring an income yielding investment for the benefit of a life beneficiary under the Lonas will.

But the situation inferred by counsel for the Beecher estate contemplates that this assignment was not pursuant to these perfectly legitimate and right purposes. It is assumed to have been, rather, because the executor, actuated by a loss in some way of funds of the Lonas estate, was seeking to escape embarrassment or worse by tortiously transferring an asset from the quiescent Beecher estate to the more turbulent Lonas estate.

In order to pursue a line of reasoning designed to give careful judicial consideration to the Beecher people's contention, brief attention will be given to a tracing through of the above-stated connected propositions of their counsel.

As to number (1), there is no question at all but that counsel is correct in his analysis of applicable law leading to the conclusion that the statute relied on by the Lonas people is analogous to or a species of " Statutes of Fraud ". These the court, in the exercise of its equitable jurisdiction, will never permit to be used as an instrument of fraud. (*Robbins* v. *Robbins,* 89 N. Y. 251.) The species of fraud (terminal as distinguished from incipient fraud) primarily contemplated by this and other similar statutes is prevented by the various Statutes of Fraud in the vast majority of the instances where such statutes are applicable. These statutes are, or should be, always read as if (to apply the construction to the present statute, Personal Property Law, § 33), the Legislature had prefaced the above-quoted provision by, " Except in cases of proven fraud in its inception ". That this is so is elementary. If it were definitely established that the assignment in 1943 was tainted by fraud, as surmised by counsel for the Beecher estate, then his line of

reasoning, as to rebutting the ordinary presumption against fraud as well as the quoted statutory provision, would need to go no further than the number (1) link of his chain of interrelated factors as above analyzed and stated.

But, since, as recognized by counsel, the ultimate issue here is as to the veritable existence or nonexistence of fraud in conjunction with the transaction, he needs to and does go into the above-stated further factors.

We must agree with counsel as to his assertion that the circumstances surrounding the transaction here in question are " suspicious ". Shortages exist in both estates. The deficit in the Beecher estate, according to the account, is $2,452.33. The net for distribution in the Lonas estate, as per its accounting, should be $20,667.99, but actually is $5,992.70, leaving a deficit of $14,675.29.

Coming now to link (3), there is no question whatever but that, as a general proposition, the existence of a fraudulent motivation in any transaction such as this does not need to be proven by direct and absolute evidence. It may be inferred from circumstances. Indeed, if this were not so, such a field day for rampant fraud would be introduced in society as to overturn our established order. Among the authorities as to the part played by inference in the discovery of and dealing with fraud, see *Greenwald* v. *Wales* (174 N. Y. 140, 145); also, *Matter of Sherower* (171 Misc. 295, 297).

The next step, in considering counsel's assembly of coordinated parts in support of his theory, is as to whether the " suspicious circumstances " present in this case are of sufficient significance so that fraud may be inferred. It is also implicit in his contention that such inference is inescapable, unless, bringing into play the fifth link in his chain of argument, respondents identified with the Lonas estate explain away the " suspicious circumstances " so satisfactorily that their burden of proof is supported, despite them, as well as it would have been had there been no such circumstances. Both of these latter two points also are well taken. (*Hoffay* v. *Hershenstein,* 232 App. Div. 149.)

Somewhat dissociated from the above-exposed links of the chain comprising counsel's contention, he also has raised the point that the assignment is invalid, in any event, because of the stern and absolute prohibition of self-dealing to which all fiduciaries are inexorably subjected by courts. (*Meinhard* v. *Salmon,* 249 N. Y. 458.) But this case, whatever else it is, is

not this. The executor of the Beecher estate assigned the mortgage to the executor of the Lonas estate. He acted as two separate entities, as much so as if the Governor of South Carolina were to transact some business with the Governor of North Carolina. But the common executor, as an individual, was not involved. The case is entirely free of any wrongdoing of the particular category known as " self-dealing ". Of course, the former executor would have been, or, as it is now, his estate is, liable to surcharges in both estates. If this were an ample source of reimbursement, quite naturally, there would then have been no such strenuous controversy activated herein as we have presently to deal with in respect to which of the two estates is the rightful and legal owner of the Whaley mortgage.

To sum up, as to the Beecher beneficiaries, the central thought of their position is that equity must deny a determination, the finding of which would be inequitable. But the ultimate problem still hinges upon determining what is " equitable " as such determination is impinged upon by established principles governing the weight of various criteria determinative of such an issue. In somewhat plainer language, although the accountants' burden of proof does not abate because of alleged fraud, the composite effect of all the evidence, including presumptions and inferences to the extent to which they are warranted, must, necessarily, be considered in order to arrive at a determination of the overall preponderance of the evidence.

The burden of proof is on the Lonas estate to vouch its account including, of course, the asset here in question. (*Abrahamson* v. *Steele,* 176 App. Div. 865.) If there were no such circumstances as we have noted, creating or tending to create some suspicion of fraud, then there would be no complicated question as to the Lonas estate's having supported its burden of proof. This burden of proof would then rest on the simple initial presumption that the assignment was regular and for a good consideration. Even without the statute this would be so.

Before we reach the question as to the sufficiency of the basis of inference of fraud, we must be satisfied that it would be applicable. When consideration for the assignment is challenged and " suspicious circumstances " are pointed to by the Beecher estate, the Lonas estate does not therefore absolutely lose the benefit of the ordinary presumption of *bona fides* and regularity. This presumption, together with all the evidentiary backing there may be in its support, still remains to be weighed against

any countervailing presumption or inference there may be in the case. A question to be examined is whether there is evidence, not only of sufficient weight, but also whether it was, or, at least, could have been, operative at the particular time in question. In this connection we are obliged to consider the question as to whether it is probable that the suspicious circumstances relied on existed in 1943. The *sine qua non* as to drawing the inference of fraud is that the parties interested in doing so must assume the burden of evidence establishing that whatever suspicious circumstances they claim, existed at a time when they could have motivated the alleged fraud, the date of the assignment. That this date was November 1, 1943, is not questioned by anyone. Our reconstruction of the situation as of this date involves the composite consideration of all evidentiary factors identified with the case as a whole.

As of November 1, 1943, there is no basis in evidence supporting the inference that there was any shortage *then*. It is more improbable than otherwise that there then was any deficit in the Lonas estate. Except for the negative circumstance of the absence of accurate and complete records (which is often true in estates where no question of a fraudulent violation of the duty of a fiduciary is involved), there is nothing to indicate that the assignment of 1943 was not upon a full consideration and for proper purposes as to both estates, considering the respective necessities of each. Except for the mere speculative possibility that the Lonas estate could have been short-circuited at or previous to November 1, 1943, there is no circumstance in the case tending to show in the least degree that there was then a shortage which serves as a basis of inference that the motive for the assignment was to cover up such shortage at the expense of the Beecher estate. We would have to infer this as a fact in the face of the probability, instead of possibility, that even though it might have been that all the assets of both estates were not perfectly intact in 1943, their common executor, in his capacity as executor of the Beecher estate, held sufficient funds derived from the Lonas estate to compensate the Beecher estate the $1,100 balance remaining unpaid on the mortgage in question as of the date of the assignment. The question as to the exact manner in which any of the assets of either estate were held is not clarified by evidence. The answer would not be determinative if it were. Sometimes fiduciaries, including attorneys acting as legal representatives of estates, follow the dangerous and reprehensible practice of mixing and carrying fiduciary funds in their own personal bank accounts. That this is far more probable

than otherwise in the present case, is strongly indicated by the uncontradicted fact that after the assignment of November 1, 1943, a $900 credit was carried into the Beecher estate and remains there now, the source of which is entirely unexplained except by assuming that it came from the Lonas estate. At least to this extent it definitely appears that the Beecher estate was paid for the mortgage.

It may be true that the assignment in question was executed by the common executor of both estates for purely personal reasons of his own. It may be true that holding the assignment effective may deprive the Beecher estate of an asset, or some portion of the asset in question, thereby increasing its deficit and reducing that of the Lonas estate. The judicial officer charged with the duty of determining the issue, conceivably, might have a " hunch ", as does counsel for the Beecher estate, that such was the case. But as long as judges remain something less than omniscient and infallible, issues must be determined upon the predominating evidence, determinable by according their respective weights and influences to all the elements of evidence, including, of course, such things as the location of the burden of proof and established bases of presumptions of law and inferences of fact, as these have been evolved and their application adapted during the long development of our jurisprudence.

As to the present issue, the best we can say is that it may or may not be in accord with very truth and fact to adopt the conclusion that the transaction here in question, at the time of its occurrence, was free of fraud operating now to take something away from the Beecher people. It is regrettable that sometimes there are issues which cannot be determined to the complete satisfaction of the functionary charged with adjudication, desirous above everything else to produce a just result, that such ultimate determination has surely been attained.

In the determination of the present issue, this same defect, a lack of absolute confidence in having attained perfect justice, would be identified with the alternative conclusion, and more so. Added to this, it would comprehend an inexcusable disregard of the salutary channels for the administration of justice evolved over the years to compensate as best they may for human inability to invariably discern and effectuate the truth with absolute accuracy and precision.

The more probable conclusion is that, as of the date of the assignment in 1943, the situation as to shortages had not yet developed. There is here no evidence whatever, by way of inference, or otherwise, that they had. In view of the consideration

that the circumstances indicative of fraud are in no way pinned down to the date of the assignment in 1943, they cannot be accorded the effect contended for by the Beecher estate, as a basis for the inference of fraud as of that time. The preponderance is in favor of the validity of the assignment in its inception. If there was a misappropriation of its proceeds sometime after the assignment, that is a fraud of a different color. Our conclusion as to the ownership of the so-called Whaley mortgage is that it is an asset of the Lonas estate, to be so treated in the accounting and decree upon the judicial settlement. If desired, order may be entered accordingly by agreement or upon notice, or the indicated determination of the question may be reserved for the general decree.