Odonata Ltd. v Baja 137 LLC (2022 NY Slip Op 04128)

Odonata Ltd. v Baja 137 LLC

2022 NY Slip Op 04128

Decided on June 28, 2022

Appellate Division, First Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: June 28, 2022

Before: Gische, J.P., Kern, Mazzarelli, Singh, Rodriguez, JJ. 

Index No. 654257/21 Appeal No. 16203 Case No. 2022-00553 

[*1]Odonata Ltd. Doing Business as Cowlicks Japan, Plaintiff-Appellant,
v
Baja 137 LLC, Defendant-Respondent.

Dilworth Paxson, New York (Ira N. Glauber of counsel), for appellant.
Hamra Law Group, P.C., Great Neck (Kevin S. Johnson of counsel), for respondent.

Order, Supreme Court, New York County (Melissa Crane, J.), entered on or about February 7, 2022, which, to the extent appealed from as limited by the briefs, granted, in part, defendant's motion to dismiss the complaint, unanimously affirmed, without costs.
The motion court properly dismissed the causes of action for breach of contract, specific performance, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. The documentary evidence, including email correspondence, shows that there was no valid and enforceable agreement between the parties (see CPLR 3211[a][1]; Kolchins v Evolution Mkts., Inc., 128 AD3d 47, 58-59 [1st Dept 2015], affd 31 NY3d 100 [2018]). Furthermore, there is no basis for promissory estoppel because plaintiff failed to show that it reasonably relied on a draft agreement as being a binding lease agreement between the parties, although it was the only party that signed it (In re Estate of Hennel, 29 NY3d 487, 495 [2017]).
In March 2021, plaintiff, the operator of a hair salon, notified defendant that it would be surrendering the premises effective July 7, 2021, a month before the lease was due to expire, because it could no longer afford the rent. In response, defendant offered to forgive certain rent and late fees. It also relayed to plaintiff that it would consider a third modification to the lease, at a lesser rent and on more favorable terms, stating that tenant had been a "great" tenant. Plaintiff replied that it had already found new spaces to rent at lower base rents and that it was prepared to move. Plaintiff then presented defendant with a counteroffer of an even lower base rent, and other more favorable terms, stating that it was more in line with "generous" offers it had received from other property owners. Defendant acknowledged receipt of the counteroffer and advised plaintiff that it would provide a "formal reply" to its counteroffer and that it was subject to a lease amendment signed by both parties.
The parties entered into negotiations, aided by an advisor affiliated with defendant. Over the course of several weeks, the parties exchanged redlined versions of a proposed third lease amendment. After several drafts were exchanged, plaintiff sent defendant the latest copy of its proposal and defendant's advisor asked for a "clean" copy of it. Plaintiff forwarded a clean copy of the document, bearing its signature. The document included a signature block for defendant.
Two weeks later, plaintiff inquired about the status of the proposed lease and asked for an "update." It then sent another email, asking whether there were "any issues?" A few days later, defendant emailed plaintiff that it had rejected the proposed amended lease. Notwithstanding defendant's unequivocal rejection, plaintiff sent defendant a check purporting to be a payment of rent under the third amended lease. Defendant promptly rejected the check and sent it back to plaintiff, stating there was no agreement because [*2]both sides had not signed the third amended lease to lease and it had not agreed to its terms.
The commercial lease and the second amendment to the lease expressly provided that any changes to the agreement could only be made in writing and signed by the party against whom enforcement of any modification is sought. The purported third amended lease not only modified plaintiff's rent obligations, defendant would have also forgiven some unpaid rent and late fees. The email exchanges unequivocally demonstrate that plaintiff was informed and was aware that the signature of all parties was required to amend the lease a third time.
Contrary to plaintiff's contention, there was no meeting of the minds. Defendant rejected the proposed amendment and immediately sent back the check that plaintiff tendered as "rent payment" under the purportedly new amendment (cf. Newmark & Co. Real Estate Inc. v 2615 E. 17 St. Realty LLC, 80 AD3d 476, 477 [1st Dept 2011] ["the record contain[ed] no evidence that defendant . . . rejected any of the provisions in the last version of the agreement"]).
Although the amended lease allowed for its execution in counterparts, it did not eliminate the need for both parties' signature on the amended lease in order for it to be a binding agreement. Furthermore, a lease is the conveyance of real property by the landlord to the tenant, and in order for it to be effective it must be in writing subscribed by the party to be charged (General Obligations Law § 5—703[2]). Because the third amendment was intended to be for a time period longer than one year, it required a signed agreement to satisfy the Statute of Frauds (General Obligations Law §5-703[1]).
Plaintiff nonetheless urges us to apply equitable principles of promissory estoppel, which is not dependent on whether the writing satisfies the Statute of Frauds requirements. Plaintiff describes various financial losses and missed opportunities it suffered as a result of its reliance on the third amendment to the lease that defendant did not sign and then rejected. The elements of promissory estoppel are a clear and unambiguous promise, reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained in reliance on that promise (DelMestro v Marlin, 168 AD3d 813, 816 [2d Dept 2019]). Plaintiff has not shown that its reliance on the document bearing only its signature was "reasonable." The amendment had to be approved by defendant and then signed by both parties. Even if plaintiff agreed to each of the terms defendant requested during their negotiations, the lease was still subject to defendant's final approval and it required both parties' signatures. These requirements were a constant thread throughout the parties' emails and negotiations. It was, therefore, unreasonable for plaintiff to have relied on the document it sent to defendant as being a binding, enforceable lease agreement accepted by defendant.
Viewing the facts in the light most favorable [*3]to plaintiff, which is that it lost a seemingly favorable lease, passed up on other opportunities and incurred financial losses, the result does not "shock the conscious and confound the judgment of any person of common sense" (In re Estate of Hennel, 29 NY3d at 497). Defendant offered plaintiff a lease modification, plaintiff counteroffered, and ultimately their negotiations did not result in a mutually signed agreement. Plaintiff had no reasonable basis to believe it had a binding agreement with defendant. It is unclear what distinguishes this case from ordinary negotiations to modify a lease to warrant equitable relief. Promissory estoppel is "reserved for that limited class of cases where the circumstances are such as to render it unconscionable to deny the promise upon which the plaintiff relied" (In re Estate of Hennel, 29 NY3d at 495). 
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: June 28, 2022